IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| LYNN HANKINS, ) <br> ) <br>       **Plaintiff,** ) <br> ) <br>   v. ) <br> ) <br> BEST BUY CO., INC., ) <br> BEST BUY STORES, L.P., ) <br> RAYMOND SILVA, and ) <br> SCOTT AZARA, ) <br> ) <br>       **Defendants.** ) | No. 10 CV 4508 <br><br> Judge Joan H. Lefkow |

## OPINION AND ORDER

Lynn Hankins filed his second amended complaint against Best Buy Co., Inc., Best Buy Stores, L.P., Raymond Silva, and Scott Azara alleging race discrimination, retaliation, and termination in violation of 42 U.S.C. § 1981, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2 *et seq.* ("Title VII"), and the Illinois Human Rights Act, 775 Ill. Comp. Stat. 5/1-101 *et seq.* ("IHRA").[1] Before the court is defendants' motion to dismiss certain Title VII and IHRA claims alleged in Counts IV–IX of the second amended complaint. For the following reasons, defendants' motion [#27] will be granted.

---

[1] This court has jurisdiction over Hankins's Section 1981 and Title VII claims under 28 U.S.C. §§ 1331 and 1343(a) and 42 U.S.C. § 2000e-5(f)(3). As discussed *infra* at 9–11, this court does not have jurisdiction over Hankins's IHRA claims. Venue is proper in the Northern District of Illinois under 28 U.S.C. § 1391(b) because the parties reside in this district and a substantial part of the events giving rise to Hankins's claims occurred in this district.

## BACKGROUND[2]

Lynn Hankins is an African-American male who worked for defendants Best Buy Co., Inc. and Best Buy Stores, L.P. (collectively, "Best Buy") from 1995 until January 15, 2010. Between 1995 and 2005, he worked as Merchandising Manager, Operations Manager, Sales Manager, General Manager, Change Implementation Trainer, District Manager, and Director of Customer Centricity Transformation at Best Buy stores and offices in Illinois and Michigan.

Lynn Hankins's brother, Robert Hankins, also worked at Best Buy. Robert started working as a security guard at a Matteson, Illinois, store and was later promoted to Merchandising Manager in Evanston, Illinois. In April 2002, Robert was transferred to the Best Buy store on North Avenue in Chicago's Lincoln Park neighborhood. Raymond Silva, a white male, was the store's General Manager. According to Robert, Silva allowed white managers, including Carl Costabile, to make sexually explicit comments and gestures that were based on racial stereotypes. Silva and Costabile also "partied" with white managers at the North Avenue store, covered for each other when the partying resulted in absences or tardiness, and excluded Robert from their social activities. As a result, Robert's professional progress was stymied. Sometime in 2004, Robert took a short leave of absence to receive treatment for depression. Silva fired Robert on April 1, 2004, while he was still on leave.

In September 2005, Robert filed suit in this district against Best Buy Stores, L.P., alleging that Silva and other white male assistant managers had subjected him to verbal and physical harassment in violation of the American with Disabilities Act ("ADA") and Title VII. (*See*

---

[2] The following facts are taken from the second amended complaint and are presumed true for the purpose of resolving the pending motion.

Compl., Case No. 05 C 5156.) Robert's complaint alleged that he was denied pay increases and favorable shifts that were given to male managers who weren't African-American, that he was evaluated according to more stringent disciplinary and performance standards than the other managers who weren't African-American, and that managers in his division constantly referred to and touched his genitals and buttocks, played sexually explicit games in his presence, and made vulgar comments about sex. (*Id.* ¶¶ 11–13.) Robert's lawsuit settled for an undisclosed amount in 2006.

Lynn Hankins had minimal contact with his brother and was not aware of the allegations in Robert's complaint. Indeed, during the same month when Robert filed his complaint, Lynn was promoted to the position of Director of Segment Services Strategy Innovation. In this position, Lynn worked closely with ten designated "lab stores" to test new products and services for possible national implementation. Lynn was also, for the first time, required to work with Silva because the North Avenue store was one of the ten designated stores. Silva was hostile and disrespectful towards Lynn, even though Lynn was Silva's superior. In April 2006, Lynn was promoted to the position of Territory Services Director. This position was created specifically for Lynn and his primary responsibility was to implement Best Buy's "Geek Squad" program on a national level. The "Geek Squad" is Best Buy's extremely successful repair, installation and setup service.

Silva, in the meantime, was promoted to District Manager and then moved laterally to Customer Experience Manager. As a Customer Experience Manager, Silva planned events for Best Buy. Lynn and Silva were now required to work together frequently. On one occasion, Silva verbally abused Lynn while they were on a conference call and then came into Lynn's

office and cursed at him and threatened him with a baseball bat. On another occasion, Silva accused Lynn of being "on drugs." This accusation was reminiscent of Silva's harassment of Robert, whom Silva had accused of being drunk at work.

Many of the events that Silva planned took place at bars and strip clubs that had mostly white, male patrons. Lynn attended the events because he was required to socialize with other managers in the Chicago area, but usually he was the only African-American present. During a business trip in Indiana, Lynn went to dinner with the other Best Buy employees but did not go out drinking with them because he did not want to be the only African-American patron at an all-white bar. The next morning, Silva asked Lynn whether he thought he was "too good" for the other employees and told Lynn that he had missed an opportunity to learn something. During an event at Jilly's Bar on Rush Street in downtown Chicago, Lynn was called a "nigger" by another Jilly's patron. Lynn was upset, and he later talked to Silva about scheduling events in more racially diverse venues and suggested that Best Buy have an event at the South Loop blues club Buddy Guy's Legends. Silva responded, "These are not our people," and then said that Buddy Guy's Legends was in a dangerous part of the city. Another time, Lynn suggested that Best Buy hold an event at a reggae club on Clark Street. Silva rejected this idea, too.

Silva frequently used his position to cultivate his own relationships with prominent sports and entertainment figures at Best Buy's expense. He took a group of Chicago-based Best Buy employees on a trip to Florida to install a home theater for Chicago White Sox catcher A. J. Pierzynski. Lynn believed that Silva should have used employees in Florida for the installation, rather than paying for the travel expenses of Chicago employees. When Lynn questioned Silva

about the expenditures, Silva was extremely hostile. Silva was never reprimanded or disciplined after the trip.

In September 2007, Lynn transferred to the position of General Manager at a Best Buy store in Downers Grove because the Territory Services Director position was phased out. The District Manager for Lynn's store was Scott Azara, a white male who was Silva's good friend. Azara cut the hours that were allocated to Lynn's store in order to make it harder for the store to earn revenue. He treated Lynn less favorably than he treated white managers, whose mistakes he frequently hid from upper management. Azara also directed Lynn to hire Costabile as an Inventory Manager even though Lynn did not think Costabile was qualified for the position. Then, in September 2009, Silva was promoted to the position of Regional Manager and became one of Lynn's bosses.

At around the time of Silva's promotion, Lynn began to prepare for Christmas sales at the Downers Grove store. Azara had instructed all of his managers to sell distressed merchandise and end of life products, even if the merchandise would be sold at a discount to customers and employees. This instruction was consistent with Best Buy's longstanding practice of encouraging managers and employees to purchase end of life merchandise at a discount. Lynn thought that an effective method of selling end of life merchandise would be to hold a special holiday sale that applied the equivalent of the employee discount to non-employee customers.

In early December 2009, Lynn reviewed his sales plans with John Greer, the Territory Strategy Manager for the region. Lynn stated that he was considering three different ways of handling an upcoming special holiday sales event. He discussed these three options extensively with Greer, who stated that the most profitable option might be to use the equivalent of an

5

employee discount as well as gift cards.[3] Lynn was given discretion to make his own decision as to how to manage his sales event, however. On December 13, 2009, Lynn held a special sales event and he used the equivalent of the employee discount of 5% above cost rather than applying the discount of 10% on all products that had been used in years past. The event was a financial success. The next day, Greer indicated that he was pleased with the results of the sale and agreed that Lynn should hold a similar event the next weekend. Greer never indicated that the event might violate company policy.

Approximately two days later, the district's Loss Prevention Manager and Human Resources Manager visited Lynn and asked about the sales event. Lynn described the event in detail, as well as his rationale for applying the employee discount rate of 5% above cost. Lynn asked if there was any problem with the event. He was told that there was no problem and to go ahead with the sale that was planned for the upcoming weekend. Lynn held the second sale on December 20, 2009. Two days later Lynn purchased two "end of life" laptops that were left over from Black Friday and a damaged television set and stand. Both of these items were available to any customer or employee during the sales events but they had not been sold. Lynn's purchases were consistent with Best Buy's written policies, were similar to purchases made by employees at other stores, and did not affect the profitability of the Downers Grove store.

On January 11, 2010, Lynn was told that a complaint had been filed against someone in his store and that he needed to fill out and sign a witness statement. He was asked to provide a written statement to define the company's standard operating procedures for selling open items

---

[3] The second amended complaint does not describe the other two options considered by Lynn Hankins and discussed with Greer.

and end of life merchandise. Lynn filled out a witnesses statement and signed it, after being asked to make several changes to the statement. Although Lynn's managers told him that they were investigating a complaint filed against another employee, in fact they were building a case that was orchestrated by Silva and Azara to terminate Lynn because of his race.

Four days later, Azara told Lynn that he was fired and that the action was "blessed at the highest levels by Ray Silva." Lynn would not be afforded the peer review appeals process provided for in Best Buy's employee policies manual. Lynn received an Involuntary Separation Notice that stated that he had been terminated because he (1) provided the employee discount to customers at the December 13 sale contrary to advice given by a member of the territory finance team and without knowledge of and approval by his District Manager, (2) purchased several items at a discounted price without seeking prior approval, and (3) failed to provide parameters to his employees regarding the procedures to be followed for the sale of open box, end of life, and at-risk merchandise.

Lynn appealed to Best Buy's Human Resources Department and requested reinstatement to his old position. Best Buy conducted an investigation. None of the resulting witness statements cite any written policies or procedures that support Best Buy's allegations of misconduct against Lynn. Azara nevertheless upheld the termination decision. On the other hand, white General Managers who had authorized the same types of employee discounts were not terminated or reprimanded. Costabile was later given Lynn's old job as General Manager of the Downers Grove store, despite the fact that he had also participated in the authorization of employee discounts and had made discounted purchases himself.

On January 28, 2010, Lynn filed a charge alleging discrimination with the Equal Employment Opportunity Commission ("EEOC") and the Illinois Department of Human Rights ("IDHR").[4] The particulars of the charge state:

> I began my employment with Respondent on or around September 1995. My most recent position was General Manager. Throughout my employment I performed my job duties satisfactorily. While employed I was associated through a family member with an EEOC Investigation. On or around January 12, 2010, I was suspended pending an investigation. Subsequently on January 15, 2010, I was discharged.
>
> I believe that I have been discriminated against because of my race, Black, and retaliated against for engaging in protected activity in violation of Title VII of the Civil Rights Act of 1964, as amended.

(Second Amend. Compl., Ex. A.) Lynn checked two boxes on his EEOC charge indicating that he was alleging discrimination based on race and retaliation. (*Id.*) The EEOC issued a notice of right to sue on May 7, 2010. (Second Amend. Compl., Ex. B.) Lynn filed his complaint on July 20, 2010.

## LEGAL STANDARD

A motion to dismiss under Rule 12(b)(6) challenges a complaint for failure to state a claim upon which relief may be granted. Fed. R. Civ. P. 12(b)(6); *Gen. Elec. Capital Corp.* v. *Lease Resolution Corp.*, 128 F.3d 1074, 1080 (7th Cir. 1997). In reviewing a Rule 12(b)(6) motion, the court takes as true all facts in the complaint and draws all reasonable inferences in favor of the plaintiff. *Dixon* v. *Page*, 291 F.3d 485, 486–87 (7th Cir. 2002). To survive a Rule 12(b)(6) motion, the complaint must provide the defendant with notice of the claims and establish that the requested relief is plausible on its face. *Ashcroft* v. *Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1949,

---

[4] The EEOC and the IDHR have a work-share agreement whereby a charge filed with the EEOC is deemed filed with the IDHR.

173 L. Ed. 2d 868 (2009); *see also Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). At the same time, the plaintiff need not plead legal theories. *Hatmaker* v. *Mem'l Med. Ctr.*, 619 F.3d 741, 742–43 (7th Cir. 2010). Rather, it is the facts that count.

## ANALYSIS

### I. IHRA Claims

Defendants argue that Lynn Hankins cannot pursue the IHRA claims alleged in counts VII, VIII, and IX that are premised on alleged adverse actions other than his discharge and theories other than disparate treatment discrimination because such claims were not included in his EEOC charge. In addressing this issue, both parties mistakenly cite to case law regarding exhaustion of administrative remedies under Title VII, rather than the administrative framework set forth in the IHRA.

The IHRA, together with the rules and regulations of the IDHR and the Human Rights Commission, "establish comprehensive administrative procedures governing the disposition of alleged civil rights violations." *Blount* v. *Stroud*, 904 N.E.2d 1, 7, 232 Ill. 2d 302, 328 Ill. Dec. 239 (2009); *Mein* v. *Masonite Corp.*, 485 N.E.2d 312, 315, 109 Ill. 2d 1, 92 Ill. Dec. 501 (1985). The IHRA limits the court's jurisdiction to claims that have first been raised through the administrative procedures set forth in the statute. *See* 775 Ill. Comp. Stat. 5/8-111(D) ("[e]xcept as otherwise provided by law, no court of this state shall have jurisdiction over the subject of an alleged civil rights violation other than as set forth in this Act"); *Blount*, 904 N.E.2d at 7 (noting that prior version of section 8-111(D), which contained identical language to the current version, "expressly limit[s] the court's jurisdiction"); *Garcia* v. *Vill. of Mount Prospect*, 360 F.3d 630, 640

(7th Cir. 2004) ("[T]he Act also limits the jurisdiction of Illinois courts, mandating that any party seeking to pursue a civil-rights claim in Illinois must first exhaust administrative remedies under the Act . . . .").[5] Thus, before Hankins can bring his IHRA claims in court he needed to satisfy the administrative procedures set forth in the Act. *Garcia*, 360 F.3d at 640; *Flaherty* v. *Gas Research Inst.*, 31 F.3d 451, 458–59 (7th Cir. 1994).

Hankins's charge was filed with the EEOC and designated to be cross-filed with the IDHR in accordance with the agencies' work-share agreement. (*See* Compl., Ex. A.) The version of the IHRA in effect when Hankins's charge was filed provides that, under these circumstances, the charge was deemed filed with the IDHR and the EEOC on the same date. *See* 775 Ill. Comp. Stat. 5/7A-102(A-1)(1) (2010).[6] Upon receipt of a charge filed with the EEOC, the IDHR was required to notify Hankins that he might also proceed with his charge before the IDHR. *See* 775 Ill. Comp. Stat. 5/7A-102(A-1)(2) (2010). The statute further provides that "[t]he complainant must notify the [IDHR] of his or her decision in writing within 35 days of receipt of the [IDHR's] notice to the complainant and the [IDHR] *shall close the case if the complainant does not do so*." *Id.* (emphasis added). The IDHR would take no action until the EEOC made a determination of the charge. *Id.* Then, after the EEOC reached its decision, the IDHR would "either adopt the [EEOC's] determination or process the charge pursuant to the [IHRA]." *Id.* Only after the IDHR

---

[5] The IHRA was amended in 2007 to provide complainants with the option of pursuing civil rights claims in court in certain circumstances. *See Blount*, 904 N.E.2d at 15 (discussing Pub. Act. 95-243, eff. Jan. 1, 2008 (amending, *inter alia*, sections 7A-102 and 8-111)). The Act's jurisdiction provision remained intact. *See id.*

[6] Section 7A-102(A-1) was subsequently amended by Public Act 97-596 § 5, effective August 26, 2011. *See* http://www.ilga.gov/legislation/publicacts/fulltext.asp?Name=097-0596&GA=97.

adopted the EEOC's determination or failed to issue its own report within 365 days could Hankins commence a civil action in court. *See id.*; 775 Ill. Comp. Stat. 5/7A-102(D), (G) (2010).

Hankins has not alleged any facts that relate to the administrative procedures set forth in the IHRA. Crucially, he does not allege that he provided notification to the IDHR that he wished to proceed with his case. This omission "cannot be reconciled with the IHRA's text, which plainly and expressly requires a complainant wishing to pursue his charge before the IDHR to inform the IDHR within 35 days of receiving the IDHR's letter." *O'Connell* v. *Cont'l Electric. Constr. Co.*, No. 11 C 2291, 2011 WL 4916464, at *12 (N.D. Ill. Oct. 17, 2011). Hankins has not submitted any documentation other than his charge of discrimination, filed with the EEOC and the IDHR, and the EEOC's notice of right to sue. As the framework set forth by the Act makes clear, however, the fact that Hankins received a right to sue notice from the EEOC does not establish that he may bring suit under the IHRA. *See, e.g.*, *id.*; *Jimenez* v. *Thompson Steel Co., Inc.*, 264 F. Supp. 2d 693, 695 (N.D. Ill. 2003); *Shelton* v. *Ernst & Young, LLP*, 143 F. Supp. 2d 982, 990 n.9 (N.D. Ill. 2001); *Ellman* v. *Woodstock #200 Sch. Dist.*, No. 99 C 50017, 2001 WL 218958, at *7 (N.D. Ill. Feb. 26, 2001). Because Hankins has failed to allege any facts from which the court could conclude that he satisfied the administrative procedures set forth in the IHRA, counts VII, VIII, and IX must be dismissed without prejudice. *See Donnelly* v. *Yellow Freight Sys., Inc.*, 874 F.2d 402, 411 n.11 (7th Cir. 1989) (proper remedy is to dismiss without prejudice when plaintiff fails to exhaust administrative remedies under the IHRA).

**II.     Title VII Claims**

In support of their motion to dismiss Hankins's Title VII claims, defendants argue that (1) any claims based on allegedly adverse actions other than his discharge or based on theories

other than disparate treatment discrimination are beyond the scope of Hankins's EEOC charge, and (2) the second amended complaint does not allege facts sufficient to state a claim based on a disparate impact theory of liability.

### A. Failure to Exhaust Administrative Remedies

Before bringing a Title VII claim in court, a plaintiff must file a charge of discrimination with the EEOC and receive a right to sue notice from the EEOC. *Conner* v. *Ill. Dep't of Natural Res.*, 413 F.3d 675, 680 (7th Cir. 2005); *Cheek* v. *W. & S. Life Ins. Co.*, 31 F.3d 497, 500 (7th Cir. 1994); *Alexander* v. *Gardner-Denver Co.*, 415 U.S. 36, 46, 94 S. Ct. 1011, 39 L. Ed. 2d 147 (1974). The claims alleged in the plaintiff's complaint must be "like or reasonably related to the EEOC charge" and "reasonably . . . expected to grow out of an EEOC investigation of the charge." *Peters* v. *Renaissance Hotel Operating Co.*, 307 F.3d 535, 550 (7th Cir. 2002) (quoting *Harper* v. *Godfrey Co.*, 45 F.3d 143, 148 (7th Cir. 1995)). Claims are deemed reasonably related if there is a factual relationship between them. *Cheek*, 31 F.3d at 501. "This means that the EEOC charge and the complaint must, at a minimum, describe the same conduct and implicate the same individuals." *Id.* The purpose of this rule is to "afford[ ] the EEOC and the employer an opportunity to settle the dispute through conference, conciliation, and persuasion and [give] the employer some warning of the conduct about which the employee is aggrieved." *Id.*

Count IV of Hankins's second amended complaint, which asserts a claim for race discrimination, alleges that Best Buy "denied Mr. Hankins the equal terms, conditions, benefits or privileges of employment" and that he was "treated, classified, or segregated . . . on the basis of his race." (Amend. Comp. ¶¶ 131–32.) Count V asserts a claim for retaliation but does not specify the employment action that forms the basis of Hankins's claim. Thus, the broad

allegations in the second amended complaint could encompass numerous types of adverse employment actions. Hankins does not clarify the scope of the claims in response to defendants' motion to dismiss. Nevertheless, it is clear that Hankins's EEOC charge only put Best Buy on notice of claims relating to his suspension and discharge in January 2010. The charge states, in relevant part, that Hankins was "associated through a family member with an EEOC Investigation," that he was suspended on January 12, 2010, and then discharged on January 15, 2010. (Second Amend. Compl., Ex. A.) These allegations do not indicate that Hankins was denied promotions or bonuses or disciplined prior to January 2010, and Hankins cannot now bring claims based on these allegedly adverse employment actions. *See Kolupa* v. *Roselle Park Dist.*, 438 F.3d 713, 16 (7th Cir. 2006) (EEOC charge did not put employer on notice for failure to promote or retaliation claims when it only discussed discharge and written warnings), *abrogated on other grounds by Bell Atl.*, 550 U.S. at 555; *Conley* v. *Vill. of Bedford Park*, 215 F.3d 703, 710 (7th Cir. 2000) (allegation of discriminatory suspension not like or reasonably related to allegations of unpleasant job assignments, lack of overtime and failure to promote); *Rush* v. *McDonald's Corp.*, 966 F.2d 1104, 1111–12 (7th Cir. 1992) (racial harassment claims not presented to EEOC where charge alleged that she had been wrongfully terminated, identified a discriminatory policy, and complained generally of discrimination); *see also Nat'l R.R. Passenger Corp.* v. *Morgan*, 536 U.S. 101, 114, 122 S. Ct. 2061, 153 L. Ed. 2d 106 (2002) (employment decisions such as termination, failure to promote, and refusal to hire are discrete employment actions that constitute separate actionable unlawful employment practices).

      Counts IV and VI of the amended complaint, which assert claims for race discrimination and termination, further allege that Best Buy's "facially neutral performance evaluation system,

compensation system, including for annual merit increase adjustments, promotion system and/or disciplinary policies intentionally or unintentionally discriminated against Mr. Hankins by disparately or adversely impacting his [employment]." (Amend. Compl. ¶¶ 133, 146.) Hankins's EEOC charge did not put Best Buy on notice regarding these disparate impact claims. Disparate impact liability under Title VII is premised on the theory that a facially neutral policy resulted in discrimination against members of a protected class. *See Reidt* v. *Cnty. of Trempealeau*, 975 F.2d 1336, 1340 (7th Cir. 1992) (citing *Dothard* v. *Rawlinson*, 433 U.S. 321, 329, 97 S. Ct. 2720, 53 L. Ed. 786 (1977)). Thus, to put Best Buy on notice of such a claim, Hankins's charge would at least need refer to an employment practice that disproportionally affected African-American employees. Hankins's EEOC charge does not describe any employment practice that adversely impacted African-American employees and does not allege that any other African-American employee was affected by Best Buy's employment decisions. Absent these facts, Hankins's EEOC charge is not like or reasonably related to the claims for disparate impact liability alleged in the second amended complaint. *See Noreuil* v. *Peabody Coal Co.*, 96 F.3d 254, 258 (7th Cir. 1996) (theory of disparate impact not like or reasonably related to allegation of retaliatory discharge where charge did not describe any allegedly discriminatory policies); *McQueen* v. *City of Chicago*, --- F. Supp. 2d ----, 2011 WL 1113192, at *10 (N.D. Ill. Mar. 23, 2011) (plaintiff could not bring disparate impact claim based on allegedly discriminatory policy that was not identified or described in EEOC charge); *Remien* v. *EMC Corp.*, No. 04 C 3727, 2008 WL 821887, at *5 (N.D. Ill. Mar. 26, 2008); *Bennett* v. *Schmidt*, No. 96 C 6914, 2000 WL 1161073, at *5–6 (N.D. Ill. Jul. 14, 2000). Accordingly, Hankins will be permitted to proceed with Counts

IV, V, and VI of his second amended complaint only to the extent that his claims are based on the suspension and termination that are discussed in his EEOC charge.

### B. Failure To State A Claim Based On Disparate Impact Liability

Hankins's disparate impact claims must be dismissed for the additional reason that the second amended complaint does not plead facts sufficient to state a claim under this theory of liability. In order to survive a motion to dismiss, a complaint alleging disparate impact claims must identify an employment practice that disproportionally affected members of a protected class. *See McQueen*, 2011 WL 1113192 at *11; *EEOC* v. *Scrub, Inc.*, No. 09 C 4228, 2009 WL 3458530, at *2 (N.D. Ill. Oct. 26, 2009); *Hoffman* v. *Option One Mortg. Corp.*, 589 F. Supp. 2d 1009, 1011 (N.D. Ill. 2008); *Wade* v. *Morton Bldgs., Inc.*, No. 09-1225, 2010 WL 378508, at *7 (C.D. Ill. Jan. 27, 2010). The complaint must also allege that individuals other than the plaintiff were affected by the facially neutral policy. *See Reidt*, 975 F.2d at 1341 ("[D]iscriminatory impact cannot be established where you have just one isolated decision." (quoting *Coe* v. *Yellow Freight Sys., Inc.*, 646 F.2d 444, 451 (10th Cir. 1981))).[7]

Hankins alleges that (1) Silva typically planned events at all-white venues whose patrons were hostile to African-Americans and then made racists comments when Hankins suggested that he reach out to the black community (Second Amend. Compl. ¶¶ 42–44); (2) Silva was not reprimanded for his unnecessary expenditures on a trip to Florida to install A. J. Pierzynski's sound system, even though Hankins would have been reprimanded under similar circumstances (*Id.* ¶ 47); (3) Azara regularly treated white managers more favorably than he treated Hankins by

---

[7] A plaintiff need not, however, plead facts relating to the specific statistical support that is required to set forth a *prima facie* case of discrimination under Title VII. *See Swierkiew* v. *Sorema N.A.*, 534 U.S. 506, 514–15, 122 S. Ct. 992, 152 L. Ed. 2d 1 (2002).

covering up their mistakes (*Id.* ¶ 54); and (4) Best Buy failed to apply its written policies when it disciplined Hankins and then terminated him at the behest of Silva and Azara, while white General Managers who authorized the same types of employee discounts were not reprimanded (*Id.* ¶¶ 79, 90–97). None of these allegations involves a facially neutral employment practice. Rather, they are examples of intentionally discriminatory acts and practices. Moreover, the allegations in the complaint focus on Best Buy's practices only as they relate to Hankins and do not discuss their impact on other African-American employees. (*See id.* ¶¶ 42 ("Hankins was usually the only African-American present at these events . . . ."), 47 ("Mr. Silva was never reprimanded or disciplined for such activities, which might well have resulted in disciplinary action if they had been examined with anything near the scrutiny that Mr. Hankins received later."), 54 ("Mr. Azara regularly 'covered' for white managers . . . while failing to treat Mr. Hankins fairly."), 93 ("Best Buy's practices regarding the investigation of Mr. Hankins and his termination constituted both intentional and unintentional discrimination (disparate impact) against Mr. Hankins.").) Because the second amended complaint does not identify a facially neutral employment practice that had a disproportionate impact on a protected class, the disparate impact claims alleged in Counts IV and VI must also be dismissed with prejudice for failure to state a claim.

## CONCLUSION AND ORDER

For the reasons discussed above, defendants' motion to dismiss [#27] is granted. Counts VII, VIII, and IX of the second amended complaint are dismissed without prejudice. The disparate impact claims alleged in Counts IV and VI are dismissed with prejudice. Hankins will not be permitted to proceed with Title VII claims based on allegedly adverse employment actions

other than the suspension and discharge discussed in his EEOC charge. This case is set for a status hearing on January 12, 2012.

Dated: Dec. 2, 2011          Enter: _____
                                                       JOAN HUMPHREY LEFKOW
                                                       United States District Judge